# ATTACHMENT TO COMPLAINT

1. Maria Theresa C. Vinluan (hereinafter referred to as "the Plaintiff") is the parent of two students with special needs (hereinafter referred to as MV and WV) who had been enrolled in a New York public school.

2. Mary Jo Whateley, Esq.  (hereinafter referred to as "the Defendant") is an attorney who practiced in the State of NY during the relevant time period from 2016 - 2019 and who represented the Plaintiff in matters pertaining to the educational program of MV and WV.

3. During the relevant time, the Defendant was an attorney who claimed several years of experience in litigating matters pertaining to special education in both administrative proceedings and in a court of law.

4. During the relevant time, the Defendant identified herself as both an attorney in her own practice, as staff for the law firm of Sussman and Watkins, Esqs., which is a private law firm based in Goshen, NY.

5. For part of 2017, the Defendant also practiced as staff for  Sobo & Sobo, LLP, a firm that handled mainly personal injury law suits.

6. From mid-2015 to February 2016, the Plaintiff had retained the services of another law firm unrelated to the Defendant in preparation for filing a complaint against the school district responsible for providing special education to MV.

7. In light of the first attorneys' high fees, the Plaintiff's intent to ultimately file a suit in federal court for violations of civil rights, and her discovery, only after retaining the first law firm, that those lawyers had not yet represented plaintiffs in federal court at that time, the Plaintiff sought consultation with the Defendant, who professed to have had extensive experience and

familiarity with representing plaintiffs in federal court in matters related to education and civil or constitutional rights.

8.  Furthermore, the Defendant informed the Plaintiff of her practice of only accepting cases which she believed to have a good chance of ultimately prevailing, and that therefore, she offered retainer fees that were either capped or substantially lower than the Plaintiff's first attorneys.

9.  The Defendant further explained to the Plaintiff that, if the Plaintiff prevailed, the Defendant will seek to recover attorney's fees from the school district at her regular higher rate—deemed to be $300/hour in a previous attorney fee application--and that she will then return to the Plaintiff the fees which the Plaintiff paid out-of-pocket.

10. The Defendant failed to accurately explain to the Plaintiff the process by which attorney's fees are calculated and awarded by the court or that it was possible that the recovered award may not cover the total amount the Plaintiff paid.

11. The parties initially contemplated only filing a lawsuit based on MV's education.  However, at the time of the review of MV's case, MV's brother, WV, also encountered problems with his education plan.  Therefore, the Plaintiff retained the Defendant's representation over issues pertaining for both MV and WV.

12. Had the Defendant not offered to accept an initial low fee with a mutually shared interest in the ultimate recovery of attorney's fees, and had the Defendant not expressed her understanding of the merits of the Plaintiff's IDEA and non-IDEA claims, the Plaintiff would not have retained the Defendant's representation.

13. Had the Plaintiff known of the Defendant's conflicts of interest, self-dealing, and other obstacles that would prevent the Plaintiff from prevailing and recovering attorney's fees, she

would not have agreed to the Defendant's later request to change their billing arrangement, and, instead, the Plaintiff would have sought other counsel or an advocate or proceeded *pro se*, as she ultimately did, rather than allow the Defendant to control her cases.

## CASE PERTAINING TO MV

September 2016 Complaint

14. As part of the Plaintiff's initial consultation for MV's case, and before agreeing to represent the Plaintiff, the Defendant reviewed documents from MV's file and relied on email communication with the Plaintiff to obtain requested documents, to discuss legal theories to support potential claims to be brought in court and in the administrative hearing, and to discuss the overall strategies for a multi-stage litigation that involved not only claims under the Individuals with Disabilities Education Act (IDEA), but also claims of civil rights violations pursuant to Section 504 of the Rehabilitation Act, the Americans with Disabilities Act (ADA), and Section 1983 of the Civil Rights Act.

15. Only after an extensive discussion and review of MV's records and other document relevant to the case did the Defendant express her understanding of the merits of the Plaintiff's complaints regarding MV's education plan and agreed to represent the Plaintiff in her complaint regarding the matter.

16. Although the Defendant expressed misgivings about the possibility of MV prevailing on claims based on substantive violations of the IDEA--due to  MV's relative success in graded school subjects-- the Defendant and Plaintiff discussed alternative legal arguments that Defendant agreed to have merit and which may prevail, based on IDEA procedural violations.

17. The Defendant also expressed to the Plaintiff her belief that the contemplated federal claims, had a better chance of prevailing and proposed going directly to federal court.  However, they faced the obstacle of the IDEA's requirement that administrative procedures be first exhausted before filing a claim in a court of law.

18.  After consultation with another civil rights lawyer, the Defendant and Plaintiff agreed on a course of action that contemplated federal claims under Section 504 of the RA and claims under Section 1983, but which began with an administrative complaint to meet the IDEA's requirement for exhaustion of administrative procedures.

19. After reviewing the approach taken by other lawyers who similarly contemplated a multi-stage litigation in both the administrative forum and in a court of law, and to circumvent potential obstacles including *res judicata*  and *collateral estoppel*, the Defendant and Plaintiff agreed that all issues that form the basis of the complaint will be introduced in the initial due process complaint, notwithstanding the likelihood that the impartial hearing officer may dismiss such claims.

20. The Defendant knew that the Plaintiff had specifically intended to recover attorney's fees in the event they prevail and discussed with the Plaintiff their ability to recover attorney's fees, through the IDEA and non-IDEA statutes for which they contemplated filing a complaint.

21. In light of the Defendant's apparent understanding of the multifaceted issues that formed the basis of the Plaintiff's case, including the Plaintiff's concern over the costs, the Plaintiff terminated the representation of her previous attorneys and retained the Defendant's representation.

22. In the initial agreements, drafted in March 2016, the Defendant offered to represent the Plaintiff for a flat fee of $5000 for the administrative hearing process, including the appeal to

the Office of State Review (hereinafter referred to as "OSR") if needed, and $5000 for the

federal complaint, with the provision that, if they prevail, the Defendant will seek the court's

award of attorney's fees using her previously eatablished fee of $300 per hour and will then

return to the Plaintiff the attorney's fees that the latter paid to the Defendant.

23.  At some point during the course of writing the complaint, the Defendant changed the terms

of the representation in that, instead of a flat fee, she sought an hourly fee at a reduced rate of

$200, with the understanding that the other provisions of the retainer agreement remained.

24.  The Defendant had experience with recovering attorney's fees after prevailing on a case and

knew what that process entailed, but she did not inform the Plaintiff of the manner by which

the court calculates an award of attorney's fees, and that the court only awards fees deemed

to be <u>reasonable</u>.

25.  It was the Plaintiff's understanding that, in the event they prevailed, the Defendant will return

to her all fees and costs that she paid to the Defendant, and that the latter could potentially

recover, from the school attorney's fees greater than that paid by the Plaintiff.  Thus, the

Plaintiff believed that the Defendant had incentive to prevail.

26.  The Defendant did not inform the Plaintiff of a potential conflict of interest between the

Defendant and Plaintiff once the sum total of the fees paid by the Plaintiff exceeded the

amount that a court is likely to deem to be <u>reasonable</u>:  i.e. that once the amount paid by the

Plaintiff exceeded reasonable attorney's fees, the amount that the Defendant can potentially

recover through the court becomes less than that which she had already received directly

from the Plaintiff.  Therefore, under the terms of their retention agreement, the Defendant

would  have no added incentive to prevail, and even risked having to return to the Plaintiff an

amount exceeding that which the court awarded.

27. In light of the multi-statute approach that the parties had agreed to take with respect to writing the initial due process complaint, the new billing system would have required the Plaintiff to initially pay an amount greater than that which the court would likely deem to be reasonable for an initial administrative complaint that consisted only of IDEA claims, and the Defendant would then have no added incentive for ensuring that the Plaintiff prevails or for continuing representation beyond the administrative procedures and into court.

28. Unaware of the potential conflict of interest, and in light of the soon to expire statute of limitations for some of her claims for MV, the Plaintiff had little choice but to agree to the change in the terms of the billing arrangement.

29. Due to the complexity of the initial complaint and certain unexpected measures taken by the school district, the Defendant advised the Plaintiff to initially file the due process complaint *pro se*, in September 2016, with the understanding that the Defendant will then subsequently give notice of her appearance for the Plaintiff.

30. After the complaint had been filed, the Defendant informed the opposing party and the appointed impartial hearing officer (hereinafter referred to as "IHO-M") of her representation.

31. As a party fully represented by an attorney, the Plaintiff received no direct communication regarding the proceedings from the school district or the IHO-M, and relied only on the information shared by the Defendant.

32. In 2017, during the course of an extended resolution session by which the counsels for the school district and the Plaintiff attempted to reach settlement, the Plaintiff made multiple attempts to contact the Defendant to discuss plans to go forward with the hearing, insofar as a mutually agreeable settlement appeared to be unlikely.

33. The Defendant informed the Plaintiff that the IHO-M adjourned the timeline until February 19, 2017.

34. As that deadline approached, the Defendant did not communicate with the Plaintiff, notwithstanding the Plaintiff's attempts to contact her.

35. When the Defendant eventually met with the Plaintiff, the Defendant initially gave the Plaintiff the impression that the IHO-M had given leave to amend the complaint until March 2017.

36. Later, the Defendant informed the Plaintiff that the IHO-M had dismissed the complaint without prejudice, but that they would be able to refile the complaint.

37. On March 8, 2017, the Plaintiff paid the Defendant another $3000 in connection with the complaint for MV.

38. After the Defendant refiled the new complaint (hereinafter referred to as "DPC-M1"), the Plaintiff learn from the opposing counsel and the reassigned IHO-M that the 2016 complaint had been withdrawn "by the parent." Thus, the Plaintiff discovered that the Defendant had voluntarily withdrawn the Plaintiff's 2016 complaint without informing the Plaintiff prior to doing so.

June 2017 Complaint

39. After the additional $3000 the Plaintiff paid in March 2017, the Defendant demanded that the Plaintiff to provide another $10,000 retainer for rewriting the complaint, notwithstanding the fact that the refiled complaint was largely based on the review of the same records as the first complaint.

40. The Defendant informed the Plaintiff that she will provide an invoice for the $10,000 but did not do so.

41. The refiled DPC-M1 was restructured to consist of IDEA claims but also explicitly stated its purpose of exhausting IDEA administrative procedures with the intent to pursue claims under non-IDEA statutes in court.

42. In addition to stating claims pursuant to the IDEA and NY state law, the refiled complaint incorporated an affidavit written by the Plaintiff.

43. The mandatory resolution session was relatively short-lived, in light of the prior unsuccessful attempt at a settlement.

44. Therefore, it came as a surprise to the Plaintiff when, without explanation of how the June 2017 $10,000 retainer was depleted, the Defendant demanded from the Plaintiff another $30,000 in contemplation of her attendance in hearings.

45. The Plaintiff paid to the Defendant, in divided amounts, the requested amount of $30,000, divided over 3 payments in September, November,  and December 2017.

46.  In preparation for the first hearing date, the Plaintiff had to remind the Plaintiff of the need to present to the opposing counsel, 5 days before the hearing, the exhibits to be used in the hearing.

47. Without indicating any specific document she deemed to be relevant, the Defendant instructed the Plaintiff to indiscriminately print out all email communications—which consisted of hundreds of pages-- and other documents the Plaintiff may deem relevant, and to deliver the file to the school district's administration office before the deadline expired that same day.

48. As these initial documents were delivered by the Plaintiff immediately after she printed them, the Defendant had spent no time to actually review them.

49. Regarding the Defendant's conduct, the course of the hearing was remarkable for the Defendant's multiple requests for adjournment for various reasons that were often related to acute changes in her health—e.g. dental infections or falls.

50. While these requests initially seemed reasonable, there were times when the Defendant's reasons for requesting an adjournment appeared contrived and soon drew the suspicion and objection of the opposing counsel

51. The Defendant then attempted to have the Plaintiff request an adjournment even when the Plaintiff had no health related reason to do so..

52. On September 20, the first hearing was held, but the Defendant failed to appear or request an adjournment. Thus, the IHO-M adjourned early in light of the Plaintiff having attended without representation.

53. The IHO-M's summary of the history of the complaint indicated that the September 2016 complaint had not been dismissed by the IHO-M—as the Defendant had led the Plaintiff to believe-- but had actually been withdrawn by the Defendant, not dismissed as the Defendant led the Plaintiff to believe.

54. By withdrawing the 2016 complaint without informing the Plaintiff of that course of action, the Defendant acted contrary to the Plaintiffs interest insofar as she compromised the statute of limitations (SOL) of some claims regarding events that transpired during the 2014-15 SY, which were within the IDEA's 2-year SOL at the time the September 2016 due process complaint was filed.

55. The Defendant relied on the Plaintiff's research for some of the more novel issues raised in the DPC-M1--e.g. the school's failure to account for an area of the general curriculum known as Career Development and Occupational Studies (CDOS).

56. Because the Defendant did not acknowledge all communications sent by the Plaintiff, and to the extent that, at times, the Defendant fostered a collegial relationship and engaged in academic discussions, it became unclear for which communications the defendant billed.

57. During the representation, the Defendant assigned to the Plaintiff tasks of researching novel issues related to the complaint, encouraged the Plaintiff to speculate on and to discuss potential legal theories, requested the Plaintiff's thoughts regarding various court opinions, and emailed the Plaintiff information regarding upcoming seminars on relevant issues.

58. With implied invitations such as "I think **we'll** be able to take this as a webinar at a later time." (emphasis added), the Defendant directed the Plaintiff to educational and legal conferences on issues contemplated in the Plaintiff's complaints, and about which the Defendant later expected the Plaintiff to share information and course materials, if any were provided.

59. The Defendant even directed the Plaintiff to attend courses clearly meant for legal professionals only—e.g. a course on punitive damages that grants continuing legal education (CLE) credits—but then failed to show up, leaving the Plaintiff to attend the course alone. The Defendant then requested that the plaintiff inform her of relevant points learned, and Plaintiff only learned later that the Defendant had considered that discussion billable.

60. To the extent that the ultimate complaint contemplated conspiracy claims pursuant to Sections 1983 and 1985 of the Civil Rights Act, the Defendant emailed the Plaintiff a manual regarding Racketeer Influenced and Corrupt Organizations (RICO) and lent the Plaintiff her books on the matter with the instruction to research on a possible basis for a RICO claim against the school district and its attorney.

61. In addition to research, the Defendant directed the Plaintiff to complete clerical tasks in preparation for the hearing--including the compilation, labelling, and submission of exhibits for the hearing record.  However, she failed to review the files to ensure their clear and procedurally correct format.

62. The Plaintiff co-operated with the Defendant and lent her support with the belief that her assistance helped to minimize cost and left the Defendant free to further contemplate and strengthen the arguments to be ultimately made in the post hearing brief.

63. However, notwithstanding the Plaintiff's substantial contribution to the clerical tasks and the paucity of hearing dates to account for the depletion of the $43,000 previously paid by the Plaintiff for DPC-M1, the Defendant demanded an additional $5000 in January 2018.

64. The Plaintiff paid the demanded amount with the hope that she can recover it if she prevailed.

65. However, the Defendant's strategy during the hearing was perplexing insofar as she failed to or refused to acknowledge and draw the IHO-M's attention to weaknesses in the opposition's case such as the contradictions between the testimony of the school district's witnesses and the documentary records.

66. The Defendant refused to challenge  the lawfulness of some of the opponent's actions—e.g. the issuance of  an arguably  fake diploma to a student who was not attending the school issuing the diploma.

67. During the hearing, the Defendant did not allow the Plaintiff to testify to contest the school's assertions, even when the Plaintiff pointed out the necessity of contradicting false testimonies regarding new issues raised by the opposing witnesses.

68. The Defendant assured the Plaintiff that she will address the Plaintiff's concerns and tie everything together in the post hearing brief.

69. However, rather than review the evidence in the hearing record herself, as she was reasonably expected to do, the Defendant instructed the Plaintiff to review the transcripts of the hearing, write down commentary regarding their testimonies, and provide a cross reference with the exhibits in the hearing record.

70. In April 2018, the Defendant demanded from the Plaintiff another $5000 for MV's case.

71. On May 22, 2018, in light of new information introduced during the hearing, the Plaintiff filed *pro se* a second due process complaint (DPC-M2), with a request for that complaint to be consolidated with DPC-M1.

72. When faced with the school district's motion to dismiss, the Defendant advised the Plaintiff to withdraw DPC-M2 and to refile it under her representation.   The Plaintiff did as she was advised.

73. Since the Defendant did not mention the need for a new retainer when she advised the Plaintiff to withdraw the *pro se* version of DPC-M2, it was the Plaintiff's understanding that the Defendant was drawing from the pre-existing funding for DPC-M1.

74. However, on July 9, 2018, the Defendant requested that the Plaintiff deposit another $5000 for her work on DPC-M2, notwithstanding the fact that the Defendant's rewritten DPC-M2 was nearly identical to the complaint that the Plaintiff submitted *pro se* and was completed by the Defendant within one day.

75. In addition, the opposing counsel submitted the exact same motion to dismiss the Defendant's version of DPC-M2 as she did for the Plaintiff's *pro se* complaint.

76. In response to the motion to dismiss DPC-M2, the Defendant directed the Plaintiff to "review [opposing counsel's brief] and [to]send .. [a] summary of case distinctions,"  and Plaintiff did so.

77. In light of the Plaintiff's own contributions to the creation and defense of DPC-M2, the Plaintiff deemed it unlikely that the funds remaining in the retainer for MV could have been depleted, especially when the IHO-M consolidated the DPC-M1 with DPC-M2.

78. The hearings for DPC-M1 proceeded as scheduled and a deadline for the submission of a post hearing brief was set for October 5, 2018, then later extended to October 11, 2018.  In the weeks preceding the deadline, the Plaintiff requested multiple updates from the Defendant regarding the progress of the brief.

79. Notwithstanding the looming deadline for the brief, the Defendant initially failed to respond to the Plaintiff's requests to discuss the substance of the post hearing brief.

80. When the Defendant finally responded, on October 2, 2018, she did not share a copy of her work but, instead, instructed the Plaintiff to go through the meeting transcripts again to indicate evidence that disprove the opposing witness testimonies.

81. To guide the Plaintiff's commentary, the Defendant provided the Plaintiff a copy of "CRITICAL ATTRIBUTES OF GOOD DUE PROCESS DECISIONS A Guide for the Reflective Special Education Hearing Officer."  The Defendant had also previously provided the Plaintiff a copy of an old post-hearing brief to use as a template.

82. The Plaintiff did what the Defendant instructed her to do with the expectation that the Defendant will utilize the information she wrote to supplement the writing of the Defendant's own properly written post hearing brief.

83. In response to the Defendant's expressed difficulty in finding and developing arguments, the Plaintiff sent the Defendant an email listing what she deemed to be false testimonies by opposing witnesses but which she euphemistically labelled as lacking "PWN" –i.e. "prior written notices"-- in violation of the IDEA.

84. On October 8, 2018, just three days prior to the posthearing brief's deadline, at the Plaintiff's urging, the Defendant eventually shared with the Plaintiff her draft of the said brief.

85. The draft shared by the Defendant consisted of little more than the boilerplate introduction similar to the sample post hearing brief that the Defendant had previously shown the Plaintiff, along with recitations pertaining to the Burlington-Carter criteria for reimbursement of private services under the IDEA.

86. Other than an argument regarding the school district's failure to provide the Plaintiff with adequate Prior Written Notice—the outline for which the Plaintiff had previously provided the Defendant--the Defendant's draft contained little information specific to the Plaintiff's case.

87. The Defendant's draft also contained the large gaps indicating areas where the Plaintiff was instructed to cut and paste "evidence" that the Plaintiff had previously written and sent to the Defendant. Due to incompatibilities between the Defendant's template and the Plaintiff's written work, the Defendant was unable to cut and paste the Plaintiff's notes, and thus, she assigned that task to the Plaintiff as well.

88. Therefore, at three days before the deadline for submitting a summary of arguments, it was evident that the Defendant had not spent the time required to become adequately familiar with the hearing record and the arguments that can be supported by the record.

89. Most disturbing was the Defendant's email instructing the Plaintiff "Don't do anything with CDOS," which subject was the gravamen of the complaint.

90. Considering her prior instructions to the Plaintiff to write commentaries with cross references to the record, while the Defendant herself formulated none of her own, it became evident that the Defendant never intended to familiarize herself with the issues at hand and merely intended to "cut and paste" the Plaintiffs work into the final brief.

91. From October 8 to the October 11 deadline, the Defendant left it up to the Plaintiff to add substance to the brief, fill in missing details and arguments and cross-references to the hearing record, and correct errors in the facts that the Defendant had written.

92. After the Plaintiff provided a draft for the Defendant's review on October 11 at 2:33 PM, the Defendant reviewed 10 pages out of the 45-page document, made changes to sentence structure and verbiage, and signed the document as her own before submitting it to the IHO-M.

93. On December 2, 2018, the IHO-M issued a decision dismissed the Plaintiff's complaint regarding MV.

94. On December 3, 2018, the Defendant requested that the Plaintiff replenish the retainer for MV by depositing another $5000 for her continued representation.

95. Since the IHO-M consolidated DPC-M2 with DPC-M1, the Plaintiff expected a similar consolidation of the residual funds left in the retainers, which had amounted to $58,000 since March 2017.

96. In light of the paucity of evidence that the Defendant had actually reviewed the hearing record or had taken the time to write her own brief based on that record, the Plaintiff had expected the retainers to contain residual funds.

97. Therefore, while the Plaintiff agreed to replenish the retainer to continue the Defendant's representation, the Plaintiff also requested that, before she did so, the Defendant first provide her a breakdown of the billing records for the actual work the Defendant performed thus far.

98. The Defendant agreed to provide the billing record but ultimately did not do so.

99. It bears noting, however, that the Defendant did not respond to or otherwise acknowledge some emails sent, and even required the Plaintiff to redo some tasks which the Defendant had evidently not reviewed.

100.   Furthermore, to the extent that some communications were prompted by the Defendant directing the Plaintiff to attend academic conferences and then asking for relevant points learned, the Plaintiff deemed billing for such communication to be unjustified.

101.   The Plaintiff also deemed it to be improper for the Defendant to bill full attorney's fees for tasks which were arguably clerical— e.g. providing a pre-written template for the draft and general boilerplate arguments that do not reflect the facts of the case.

102.    Ultimately, however, the Defendant did not provide the Plaintiff with a billing statement, thus keeping the Plaintiff in the dark as to how the Defendant allocated the fees she had already paid and depriving the Plaintiff of the opportunity to contest any basis of the billing which may possibly be deemed erroneous or unjustified.

103.   On December 21, 2018, the Defendant informed the Plaintiff and opposing counsel of her plan to undergo surgery in January 2019 and that she will require a 3 week period of convalescence thereafter.

104.   Prior to the Defendant's contemplated surgery, and while awaiting the Defendant's billing statements to determine if any residual funds remained to carry over to the appeal to the OSR, the Defendant and the Plaintiff continued as usual, insofar as they continued to

discuss the issues to be raised on the appeal, and the Defendant continued to review the Plaintiff's notes on the matter.

105.    However, in light of the Defendant's contemplated surgery, and the overlap between the date of surgery and the deadlines for the appeal, the Plaintiff eventually proceeded *pro se* but with limited representation from the Defendant who continued to review the Plaintiff's Request for Review by the OSR and her Reply to the opposing party's Answer, and to advise regarding proper procedures.

106.    Throughout the month of January, when Plaintiff conferred with the Defendant regarding MV's case as well as another case for another son of the Plaintiff, DV, the Defendant mentioned that she had cancelled surgery and did not inform the Plaintiff of any plan to withdraw her representation permanently.

107.    Then, on January 29, 2019, 2 days before the scheduled  with IHO-W, the Defendant informed the Plaintiff that she felt physically unfit but continued to advise Plaintiff while the latter looked for other counsel.

108.    On January 30, 2019, the Defendant informed the IHO-W that she was withdrawing from the case.  However, the Defendant offered to continue to represent the Plaintiff for the purpose of a settlement with the school district.

109.    Upon withdrawing her representation, the Defendant agreed to cap all attorney's fees to that which she had thus far received.

110.    However, the Defendant provided no billing statements to indicate whether or not the cap on the fees had been reached or if there remained any funds that remained from the $58,000 total that the Plaintiff paid and to which the Plaintiff may have been entitled as a refund.

111.    When the Defendant later informed the Plaintiff that she had ceased legal practice altogether, the Defendant also failed to return to the Plaintiff the $5000 retainer that the Plaintiff had paid for her representation in a federal complaint.

## CASE OF WV

112.    In March 2016, the Defendant agreed to represent the Plaintiff in her advocacy for WV, which case would involve Plaintiff's placement of WV in a private school.

113.     In an email exchange that occurred in March, 2016, the Defendant offered as terms of her representation:  "I will charge $3,000 retainer which will constitute 20 hours, and if we go beyond that, my hourly rate will be $150.    If that's agreeable, I will draft a retainer agreement and we can get started."

114.    The Plaintiff agreed to those terms, but the Defendant never drafted a retainer agreement for WV's case.

115.    In April 2016, the Defendant accepted Plaintiff's payment of  $5,000

116.    In September, 2017, the Plaintiff filed a due process complaint (hereinafter referred to as DPC-W1) on behalf of WV.   Due to the near expiration of the SOL of one of the issues raised in the Plaintiff's complaint, the Plaintiff initially filed the complaint *pro se.*

117.    After having the Defendant review the complaint, which specifically indicated the Plaintiff's intent to apply for an award of attorney's fees, the Plaintiff filed the amended complaint in October 2017.

118.    The Defendant then assumed representation of the Plaintiff and informed the opposing party and the appointed hearing officer (hereinafter referred to as IHO-W) of her representation.

119.    In preparation for WV's case, the Plaintiff was once again tasked with the clerical tasks of compiling and labeling the exhibit binders to be submitted to the hearing record.

120.    Notwithstanding the Plaintiff having performed these clerical tasks between January and February 2018, and that the Defendant's role involved, for the most part engaging in settlement negotiations involving issues that the school district had always stood firm, the Defendant requested from the Plaintiff  three deposits of $5000 each, which the Plaintiff paid.

121.    Then, on April 11, 2018, just before the first date of the hearing, the Defendant required the Plaintiff to deposit another $5000 for MV's case and $10,000 for WV's case to cover both the due process complaint and the appeal to the SRO.

122.     In the middle of the proceedings pursuant to DPC-W1, the Plaintiff filed *pro se* a second due process complaint for WV dated June 2018 (hereinafter referred to as DPC-W2) with a request that DPC-W2 be consolidated with DPC-W1.

123.    DPC-W2 pertained to events that occurred more than two years prior to the date of the complaint but which the Plaintiff only discovered recently, thus arguably within the statute of limitations, as defined by the IDEA.

124.    As with the case of MV, the Plaintiff discussed with the Defendant the legal arguments, and the Defendant agreed to present arguments in support of the complaint, including its timeliness.  However, the Defendant did not request a rewriting of the DPC-W2.

125.    Notwithstanding the Plaintiff's recent deposit of $10,000 for WV's case not more than 2 months prior, the Defendant demanded that the Plaintiff provide another $5000 for her representation in DPC-W2, which consisted of writing an opposition to the school district's motion to dismiss the complaint—an argument that the IHO-W had limited to only 5 pages.

126.    The IHO-W dismissed the DPC-W2 as time-barred.

127.    Upon receipt of the IHO-W's August 3, 2018 ruling, the Defendant encouraged the Plaintiff to contest the decision and explained to the Plaintiff  "I think we need to appeal ... [The IHO] does not address the applicable law ... Also, she makes representations in the beginning of the order regarding DPC-1 that I believe are inaccurate ... and should NOT be included in her order."

128.    The Defendant then requested that the Plaintiff deposit in her account another $5000 for WV's case.

129.    The Defendant did not provide a billing statement to reflect how the writing of the 5-page opposition to the school district's motion depleted the $5000 the Defendant requested for DPC-W2, not to mention the other deposits made before that.

130.    The Plaintiff agreed to the replenishment.  However, in light of her having provided multiple deposits within the preceding 8 months, including the newly requested $5000 deposit for an SRO review for WV's case, she requested from the Defendant the billing breakdown for both MV's and WV's case.

131.    The Defendant assured the Plaintiff that she will provide the billing statements for each case, but her implication that the Plaintiff owed much more than she had been paid confused the Plaintiff.

132.    Notwithstanding the Defendant's expressed conviction that the request for review by the SRO should be filed, and her receipt of the Plaintiff's additional payment, the Defendant failed to exercise vigilance with respect to the SOL for the appeal of the IHO-W's decision. Thus, the Plaintiff had to visit the Defendant at home to remind her of the looming deadline for serving the request for review.

133.    Fortunately, the Defendant and the Plaintiff were able to complete the appeal in one afternoon, with the Defendant assuring the Plaintiff that a Memorandum of Law was not required.

134.    While awaiting the decision of the SRO-W2, the hearing for the first DPC-W1 proceeded, with deadline for a post hearing summary of arguments set for December 7, 2018.

135.    One month after the last hearing date for DPC-W1, in an email dated October 31, 2018, the Plaintiff requested an update of the status of the post hearing brief. The Defendant answered, in reply, that she did not intend to work on the brief until November 10, 2018.

136.    To avoid the need for the Plaintiff to rush to add necessary information at the last minute--as had occurred in the case of MV-- the Plaintiff requested that the Defendant provide her with drafts of the brief earlier than the 3 days she had allowed for MV's posthearing brief.

137.    As in the case for MV, the Plaintiff also provided the Defendant with commentaries on the testimonies of the school district's witnesses and references to the evidence submitted into the hearing record.

138.    On November 14, 2018, the SRO-W2 released the decision annulling the IHO-W's ruling that the Plaintiff's DPC-W2 was time barred. The SRO-W2 remanded the case back to the IHO-W with an order to determine the dates of accrual of the Plaintiff's complaints in DPC-W2.

139.    For various reasons, the post-hearing brief for DPC-W1was extended from December 7 to December 21.

140.    On December 3, 2018, along with her request for $5000 to replenish MV's account, the Defendant also requested $5000 to replenish WV's account.

141.    In light of the fact that the opposition to the school's motion to dismiss was limited to only 5 pages and that the appeal to the SRO was completed within a few hours, the Plaintiff did not believe that the two deposits of $5000 she had paid for DPC-W2 and its appeal should have been depleted, even if the Defendant had submitted a Reply.

142.    The Plaintiff reminded the Defendant that she had not yet received the billing statements that the Defendant assured her would be prepared back in August 2018.

143.    As with MV's case, the Plaintiff informed the Defendant that she is willing to replenish WV's account but requested a copy of the billing statements first.

144.    Once again, the Defendant assured the Plaintiff that she will prepare the billing statements.

145.    The Plaintiff attempted to get the Defendant to provide a copy of the post-hearing brief for DPC-W1, since, in light of the brief's deadlines being just recently reset from December 7 to December 21, 2018, the brief should have already been near completion at the time of the Defendant's request for replenishment of her retainer on December 3.

146.    In an email dated December 12, 2018, the Plaintiff urged the Defendant to share what ever draft she had so far written.  The Defendant provided neither an answer nor a draft.

147.    The Defendant later admitted to the Parent that she did not believe that they were going to prevail.  Thus, the Defendant contradicted her initial assertion to the Plaintiff that she would not accept a case that she felt would not prevail.

148.    Furthermore, her reasoning belied her request, on December 3, 2018, for a replenishment of her retainer for WV and also her advice, in August 2018, that the Plaintiff appeal the IHO-W's dismissal of the DPC-W2.

149.    The Plaintiff responded by writing a draft of arguments for a post hearing brief and shared with the Defendant arguments which she believed would prevail.

150.    On December 18, 2018, the IHO-W issued an order consolidating DPC-1 with DPC-2.

151.    In a phone conference, held on December 21, 2018 for the purpose of addressing the SRO-W2's order to determine the statute of limitations for DPC-W2, the Defendant shared her plan to undergo surgery in January 2019. Thus, the pre-hearing conference for the February 7 evidentiary hearing for DPC-W2 was scheduled for February 1.

152.    While the Defendant did not actually have surgery, she informed the Plaintiff, on January 29, 2019 that she felt physically unfit and eventually withdrew from the litigation on January 30, 2019— only 2 days before the conference-- though she continued to be available to the Plaintiff for the purpose of a possible settlement.

153.    Knowing that the Plaintiff would have difficulty finding an attorney to replace her, the Defendant encouraged the Plaintiff to attempt to reach a settlement with the school district and offered to continue her representation of the Plaintiff during settlement negotiations.

154.    The Defendant also agreed to cap her fees at the amount she already received but did not provide a billing statement to indicate whether or not that cap was reached or if there remained funds for the now consolidated DPC-W1 and DPC-W2 complaints.

155.    In an email dated January 30, 2017, the Defendant divulged to the Plaintiff "I do not believe you will prevail; I see issues, but ultimately, I continue to believe you will not prevail ... Their offer to settle reimbursing full tuition will be held against you."

156.    It bears noting that, where settlement is concerned, the Defendant had previously expressed concern regarding Rule 68 of the FRCP or its equivalent under the IDEA and the

latter Act's provision that allows for the award of attorney's fees against the attorney of the parent under certain circumstances.

157.    Therefore, while the Defendant could have legitimately had concerns about her health, the Plaintiff also suspected that the Defendant's decision to withdraw was founded on personal interests other than her health.

158.    It bears noting that, as in the course of the proceedings for MV, the proceedings for WV were likewise marked by multiple requests for adjournment by the Defendant, some of which the Plaintiff appeared to be contrived.  The Defendant's pattern of delinquency was evident to the extent that the IHO-W started to decline her requests for adjournment.

159.    The Defendant's delinquency is reflected in the fact that, although, the deadlines for the post hearing brief had come close on 3 prior occasions-- December 7, December 21, and January 18, 2017--the Defendant provided the Plaintiff no initial draft to reflect any intent on her part to write a summary of arguments for DPC-W1.

160.    In light of the fact that the Defendant should have at least started drafting the post-hearing brief for the December 7 deadline—around the time that she again requested the December 3 replenishment of the retainer for WV—and even before the IHO-W's December 18,  2017 order of consolidation, her failure to do so indicated that she had never intended to fulfill her duty to actually write the said brief.

161.    The fact that she had been requesting from the Plaintiff additional funds to proceed with litigation for both MV and WV up until December 3, 2017—just 4 days prior to the initial December 7 deadline for WV's post-hearing brief—indicates that the reason for her withdrawal was due, at least in part, to the Plaintiff's request for billing records before she

provided further funding, as well as her probable lack of preparedness for the February 7 evidentiary hearing.

162.    The Plaintiff proceeded with the litigation *pro se* and prevailed at both the impartial hearing level and at the level of the Office of State Review.

163.    The awards the Plaintiff received from both the impartial hearing and the state review exceeded those that were offered by the opposing school district at the time of settlement.

164.    The school district did not appeal the decision of the Office of State Review, and the Plaintiff then proceeded to take the matter to federal court to recover attorney's fees as a prevailing party.

## FEDERAL COURT PROCEEDINGS

165.    For the proceedings in federal court, the Plaintiff contacted the Defendant to inform her of the SRO's decision and an award to the Plaintiff in excess of that which the school district had offered in settlement, and that the Plaintiff believed that there was a basis for being declared a prevailing party entitled to the recovery of attorneys fees from the court.

166.    The Plaintiff approached the Defendant with the request that the Defendant comply with their agreement for the Defendant to seeks attorney's fees and to reimburse the Plaintiff from the proceeds.

167.    Plaintiff had learned the process by which an award of reasonable attorney's fees was actually calculated by the court.

168.    The Defendant informed the Plaintiff that before seeking an award from the court, the Plaintiff should approach the school district directly and that the amount recovered may be a "compromise" rather than the actual fees paid to the Defendant.

169.   When the Plaintiff asked the Defendant how to submit a request of attorney's fees to the school district, the Defendant informed the Plaintiff that she will provide the Plaintiff the billing statement needed to request reimbursement or attorney's fees from the school district directly.

170.   Notwithstanding her assurance that she will provide billing statements, the Defendant did not provide the document.  Therefore, the Plaintiff proceeded to request from the court an award of the fees.

171.    In April 2020, a law firm offered *pro bono* representation of the Plaintiff and her sons in their federal complaint.

172.   The *pro bono* counsel engaged in settlement negotiations with the school district, which process contemplated the Plaintiff's recovery of attorney's fees paid to the Defendant.

173.   It bears noting that, in the course of the federal proceedings, the court denied the school district's motion to dismiss the Plaintiff's IDEA based claims in MV's case, thus reviving the potential for the Plaintiff's recovery of attorney's fees paid in connection with MV's claims as well as WV's.

174.   Although the Plaintiff had records of deposits made to the Defendant's bank account, the *pro bono* counsel explained to the Plaintiff that they needed the actual billing records to secure an award from the court on the Plaintiff's behalf.   For that reason, even for the purpose of settlement, having some statement from the Defendant provided a stronger argument for the potential to recover attorney's fees through settlement with the opposing party.

175.    Furthermore, when the Plaintiff's new counsel discussed with the Plaintiff the demands to be presented to the opposing party, the new counsel deemed the amount billed by Defendant to be excessive and unreasonable.

176.    In light of the Plaintiff's multiple failed attempts to obtain the Defendant's billing records, the *pro bono* firm contacted the Defendant directly.

177.    The Defendant informed the Plaintiff's *pro bono* counsel that there had been a problem with the computer at the law firm, Sussmann and Watkins, Esqs., which she continued to utilize for part of her billing records—an explanation which the Defendant had never given to the Plaintiff during the Plaintiff.

178.    The Defendant had offered to "recreate" the billing record and assured the Plaintiff that a recent ruling allowed for the submission of statements with "block billing" when petitioning the court for an award of attorney's fees.

179.    However, the Defendant only managed to provide a statement, dated November 5, 2020, accounting for the period from February-June 2017, and for a total of approximately $6500, thus leaving approximatley $52,500 of fees for DPC-M1 unaccounted.

180.    The Defendant provided no accounting of the funds paid by the Plaintiff for WV's case.

181.    While the Defendant repeatedly assured the Plaintiff and her *pro bono* counsel that she will provide documentation reflecting the fees she billed, she did not do so.

182.    Ultimately, the Defendant's continued failure to provide the Plaintiff's billing statements compromised the Plaintiff's ability to recover the amount paid either through the settlement negotiations or through litigation, thus perpetuating the damage the Defendant caused to the Plaintiff.

183.    Notwithstanding the fact that some of the Plaintiff's federal claims of unlawful

discrimination under the Rehabilitation Act and for compensatory and punitive damages

under Section 1983 of the Civil Rights Act survived the opposing party's motion to dismiss,

the Defendant's attorney's fees constituted a large portion of the relief sought, and the

Defendant's failure to provide the billing records to substantiate an application for that award

of attorney's fees was a substantial factor in the Plaintiff's decision to accept the opposing

party's offer of settlement, which required the Plaintiff to abandon claims of punitive

damages.

**Count I**
**Fraud-Based Breach of Fiduciary Duty; Conflict of Interest;**
**Fraudulent Inducement**
**(NY CPLR § 213)**
**2016 and consolidated 2017 (DPC-M1) and 2018 (DPC-M2) Due Process Complaints**

184.    The Plaintiff restates the preceding paragraphs as if fully stated herein.

185.    The Defendant is an attorney, licensed to practice in the state of NY, who continually

represented the Plaintiff from April 2016 through January 30, 2019, during which time the

Plaintiff filed multiple complaints pertaining to the education of her sons MV and WV as

well as pursuant to her own rights.

186.    Since the Defendant and Plaintiff continued to discuss the issues in the complaints during

intervals between the filings of different complaints or between a complaint for each child

and its subsequent appeal, and that the Defendant never provided billing statements between

different stages of the litigation to indicate the total depletion of funds or the termination of

her representation, the Defendant's representation of the Plaintiff may be considered to flow

from the time the Defendant accepted her fee, in April 2016, until the Defendant formally

declared her withdrawal from representation on January 30, 2019.

187.    The Defendant agreed to represent the Plaintiff in her litigations against a school district, and to attempt to recover attorney's fees for the Plaintiff, pursuant to the IDEA and other federal statutes with provisions for such a recovery of fees.

188.    During the Plaintiff's initial consultation with the Defendant, the Defendant informed the Plaintiff that she only agrees to represent clients whom she believes to have a good chance of winning, and that due to that belief, she required a lower retainer fees compared to other attorneys.

189.    The Defendant agreed to represent the Plaintiff after extensive review of documentary record and discussions of the contemplated legal strategies and presentation of the complex cases, thus leading the Plaintiff to believe that, when the Defendant agreed to represent the Plaintiff, the Defendant objectively recognized the merits of the Plaintiff's arguments under at least one of various legal theories and federal statutes, and agreed with the contemplated legal strategy and presentation of the cases.

190.    The Defendant enticed the Plaintiff into retaining the Defendant's services with low flat retainer fees for both administrative and court proceedings and an offer to recover the paid fees for the Plaintiff if the Plaintiff prevails.

191.    However, after having been retained by the Plaintiff, the Defendant later changed the terms of billing to a purportedly reduced fee of $200/hour.

192.    As an attorney who accepted from the Plaintiff payment for full representation in the latter's complaints against a school district, the Defendant owed to the Plaintiff a fiduciary duty to act in the Plaintiff's interest and to prioritize the Plaintiff's interests in such matters over the Defendant's own.

193.    The Defendant owed the Plaintiff the duty to act with candor, honesty, and loyalty, and to disclose matters that are likely to impact the Plaintiff's decisions to pursue a course of action or to abstain therefrom, including any potential or actual conflict of interest.

194.    The Defendant informed the Plaintiff of her prior experience in the recovery of attorney's fees and her previously established rate of $300/hour, thus inducing the Plaintiff to believe that the Defendant was familiar with the process of obtaining an award of attorney's fees and likewise inducing her to rely on the Defendant to know and take the necessary measures to achieve that end.

195.    Based on her previous experience, the Defendant must have known that the court awards fees based on the amount it deems to be "reasonable," not on the amount actually charged by the attorney, and that the process would likely require the submission of the attorney's billing records.

196.    Notwithstanding her knowledge and experience that the award of attorney's fees is based on the court's determination of what amount is "reasonable," the Defendant did not explain that process to the Plaintiff.  Instead, the Defendant merely explained that, if they prevailed, the Defendant will make an application to the court for an award of fees at her usual rate of $300 per hour, and that, upon receipt of the award, the Defendant shall repay the fees the Plaintiff paid to the Defendant.

197.    The Defendant did not disclose the possibility that the amount the Plaintiff ultimately paid may not be fully recoverable, even if the Plaintiff prevails, since the amount awarded is determined by what the court deems to be "reasonable" and not by what the attorney charged.

198.    The Defendant changed her billing terms from a flat rate to a discounted hourly rate but did not disclose to the Plaintiff the conflict of interest that arises when the amount the

Plaintiff paid to the Defendant exceeds the amount that the court may deem reasonable, as under such circumstances, the terms of the retainer agreement would leave the Defendant vulnerable to the possibility of having to return to the Plaintiff an amount in excess of the attorney's fees awarded by the court—i.e. excess fees that the Defendant would have kept in the event the Plaintiff lost.

199.    Thus, in the event the fees already paid by the Plaintiff are likely to exceed fees the court will deem reasonable, the terms of the retainer agreement can potentially detract from the Defendant's incentive to ensure that the Plaintiff prevails, thus jeopardizing the Plaintiff's interests.

200.    In light of the parties' agreed upon strategy to exhaust the IDEA's administrative procedures prior to pursuing claims under other federal statutes in court, and to simultaneously research the potential non-IDEA claims that could arise from the circumstances, it was foreseeable that the Plaintiff's initial attorney's fees would exceed the costs reasonably expected to be incurred in an administrative complaint purely based on IDEA violations.

201.    In light of the parties' agreement to pursue the recovery of attorney's fees, and to the extent that the Defendant agreed to address all issues—administrative and judicial—in the initial administrative complaint, it was foreseeable that the Defendant would need to maintain detailed billing records to justify an application for the award of attorney's fees under the different statutes and different stages of litigation.

202.    Notwithstanding her prior knowledge and experience with recovering attorney's fees and the need to submit billing records during that process, the Defendant did not maintain billing records throughout the proceedings like those that she presented in her prior application to a

court for such fees, thus belying the Defendant's intent to make good on her agreement with

the Plaintiff to attempt to recover the attorney's fees paid by the Plaintiff.

203.    Upon information and belief, the Defendant decided to forgo such maintenance of

records at some point but did not inform the Plaintiff of the likelihood that the funds the

Plaintiff subsequently paid may not be fully recovered in the absence of billing records to

reflect their depletion.

204.    While, for reasons stated above in Paragraphs 197-199, it was contrary to the Defendant's

interest for the Plaintiff to ultimately prevail and to seek to recover a court's award of

attorney's fees, it remained in the Defendant's interest for the Plaintiff to continue to pursue

her suit and, thus, generate fees for the Defendant.

205.    The Defendant encouraged the Plaintiff to entertain various legal theories, directed the

Plaintiff to educational conferences, assigned the Plaintiff tasks requiring communication

with the Defendant, and otherwise fostered collegial discussions for which (upon the

Plaintiff's information and belief) the Defendant billed the Plaintiff, while, at the same time,

inducing the Plaintiff to believe that the Defendant understood her arguments, supported the

merits of her claims, and believed in their ability to ultimately prevail and recover fees under

either the IDEA or another federal statute.

206.    By fostering a collegial relationship and encouraging academic discussions, the

Defendant induced the Plaintiff to believe that the Defendant had objectively assessed the

evidence, the legal strategy, and the presentation of the cases, and that the Defendant will

make a good faith attempt to prevail and to recover attorney's fees on the Plaintiff's behalf.

207.    During the course of the proceedings, the Defendant demanded that the Plaintiff

"replenish" her retainers multiple times, thus giving the impression that the funds had been

consumed through work hours invested by the Defendant, and that the Defendant was keeping track of the funds as the retained amount diminished.  However, the Defendant provided neither the work product nor the billing statements to reflect the implied depletion of the funds.

208.    The Plaintiff did comply with the Defendant's demands to replenish her retainers and did so relying on the belief that the Defendant will make a good faith attempt to enable the Plaintiff to prevail and to ultimately recover her attorney's fees.

209.    In practice, however, the Defendant undermined the Plaintiff's interests, as set forth below in Paragraphs 205 – 233.

### Due Process Complaint for MV filed in September 2016

210.    For MV's 2016 case, the Defendant voluntarily withdrew the complaint without informing the Plaintiff of doing so, thus causing the Plaintiff to forfeit the fees she paid and precluded the possibility of fee recovery as the prevailing party under the IDEA.

211.    The Defendant breached her duty to act with candor and honesty to the Plaintiff when she initially misrepresented to the Plaintiff that the IHO had given leave until March 2017 to amend the complaint and then that the IHO had actually dismissed the complaint without prejudice.

212.    Only after the complaint was refiled did the Plaintiff discover from the opposing counsel and the IHO-M (who had been reassigned to the refiled complaint) that the Defendant had not been dismissed by the IHO but voluntarily withdrawn by the Defendant on behalf of the Plaintiff but without the Defendant first informing the Plaintiff of her intent to do so.

213.    The Defendant knew of the Plaintiff's concerns regarding the IDEA's 2-year statute of limitations of some of MV's claims, but recklessly disregarded the Plaintiff's interest when

she nevertheless withdrew from the September 2016 action without the Plaintiff's sanction and prejudiced the Plaintiff's case for MV by compromising the statute of limitations of some claims regarding events from the 2014-15 school year.

214.    The Defendant increased the cost of litigation for the Plaintiff to the extent that, under the guise of the complaint having been dismissed instead of withdrawn, the Defendant sought additional fees to rewrite the entire complaint when new separate issues not included in the original complaint could have been filed as a separate complaint in parallel to and possibly consolidated with the original complaint, as allowed by the IDEA.

215.    The Defendant put the Plaintiff in the position of having to argue against the opposition's defense that the statute of limitations had expired for claims concerning the 2014-15 school year.

216.    The Defendant's willful misrepresentation to the Plaintiff --that the complaint was dismissed instead of voluntarily withdrawn—breached her duty of honesty and loyalty and deprived the Plaintiff of the notice and the opportunity to determine the Defendant's underlying reasons for the withdrawal and to renegotiate, if necessary, the terms of the Defendant's continued representation.

217.    Notwithstanding the Defendant's conversion to hourly billing instead of a flat fee, she failed to provide a billing statement to indicate how the two $5000 retainers, including the one marked as a retainer for the federal complaint, were utilized and if any funds were subject to a refund or transfer to the refiled complaint.

218.    The Defendant's unsanctioned withdrawal of the complaint, her subsequent misrepresentation to the Plaintiff that the complaint was dismissed, and her demand for additional retainer to refile the complaint evince the Defendant's self-dealing.

219.    Thus, with utter disregard for the Plaintiff's interests, the Defendant breached her

fiduciary duties to the Plaintiff to act with honesty, candor, and loyalty, and to disclose any

conflicts of interest with respect to the September 2016 complaint.

Consolidated Due Process Complaints for MV
filed in June 2017 (DPC-M1) and May 2018 (DPC-M2)

220.    During the hearing for DPC-M1, the Defendant convinced the Plaintiff to forgo oral

testimony, notwithstanding the deficiency in the Plaintiff's affidavit, which lacked

information specifically addressing new issues introduced by the opposing party's witnesses.

221.    The Defendant also refused the Plaintiff's requests to explicitly assert in the complaint or

otherwise call the IHO-M's attention to clearly wrongful acts committed by the opposing

party—e.g. the school's issuance of a false diploma to a student who was not attending the

school during the purported year of graduation, or the testimony of a key witness that clearly

contradicted the documentary evidence.

222.    Notwithstanding the Plaintiff's request during the hearing that the Defendant present to

the IHO-M the exhibits in the record that discredited the testimonies of opposing witnesses,

the Defendant refused to do so.  Thus, the Defendant allowed the opposing party to support

its case with uncontested testimonial evidence, inconsistent with documentary evidence, but

on which the IHO-M nevertheless relied.

223.    The Defendant undermined multiple attempts made by the Plaintiff to schedule a meeting

between the Defendant and the Plaintiff's witnesses prior to the date of their respective

testimonies.

224.    The Plaintiff relied on the Defendant's assurance that the Defendant will present the

exhibits refuting the opposing party's testimonies in the post-hearing brief summarizing their

arguments, but the Defendant did not address those arguments in her draft and did not give

the Plaintiff adequate time before the deadline for the brief's submission to properly remedy that deficiency.

225.    As the due process hearings neared completion, the work performed by the Defendant belied a good faith attempt on the part of the Defendant to prevail, insofar as she submitted for the Plaintiff's review a summary of arguments that was incompletely written  and reflected neither an adequate grasp of the relevant arguments and evidence specific to MV's case nor an adequate investment of time on the Defendant's part to become familiar with the relevant issues and the hearing record.

226.    Early in the course of the proceedings, the Defendant had assigned to the Plaintiff the task of reviewing the hearing records, including the hearing transcripts, and of providing an annotated analysis of how they support the assertions in the complaint or refute the testimonies of the opposing party's witnesses.  However, the Defendant did not immediately respond to them.

227.     Later, as the deadline for the post hearing brief neared, the Defendant again requested from the Plaintiff the same information, thus indicating that she did not review the Plaintiff's reports after the Plaintiff had first submitted them.

228.    The Defendant repeatedly ignored the Plaintiff's attempts, made in advance of the deadline for the post-hearing brief, to view the Defendant's draft and to discuss the substance of the arguments and supporting evidence for the arguments that the Defendant chose to present.

229.    The Defendant waited until only 3 days remained before the post-hearing brief's deadline before providing the Plaintiff her draft replete with gaps with place markers indicating to the

Plaintiff areas which she required the Plaintiff to fill herself, based on the latter's own review of the records.

230.    In writing the post hearing brief, the Defendant instructed the Plaintiff "Don't do anything with CDOS" notwithstanding the fact that the subject was the gravamen of the complaint.

231.    Thus, it became apparent that, from the first hearing date, the Defendant had intended to contribute little of her own expertise in legal analysis and had planned for the Plaintiff to shoulder most of her own representation.

232.     The Plaintiff attempted to salvage the brief in the 3 days that remained before its deadline with little oversight from the Defendant, who informed the Plaintiff that she had allocated those days to personal projects such as moving to a new apartment and spending time with her family.  In so managing the Plaintiff's case, the Defendant breached her fiduciary duty to put the Plaintiff's interest before her own during those days that were crucial to the Plaintiff's case.

233.    As it turned out, the Defendant only edited the first 10 pages of the 45-page brief that the Plaintiff provided for her review, and even then, revised mostly sentence structure and verbiage before signing the brief as her own and submitting it to the IHO-M on the due date.

234.    By mispresenting the work of the non-attorney Plaintiff as her own, rather than allowing the Plaintiff to proceed as a *pro se* non-attorney plaintiff with limited scope representation, the Defendant profited from the Plaintiff's labor and deprived the Plaintiff of the greater leniency afforded non-attorney plaintiffs compared to those fully represented by attorneys. Thus, the Defendant breached her duty to advise the Plaintiff towards courses of action that are in the latter's interest.

235.    On January 30, 2019, the Defendant withdrew her representation of the Plaintiff and her children, although she continued to be available for the purpose of settlement..

236.    While the Defendant purportedly withdrew from representing the Plaintiff due to her health, her timing is suspect in light of her previous request for the Plaintiff to replenish retainers for both MV and WV, thus indicating her intent to move forward with both cases.

237.    The fact that the Defendant's withdrawal came just 2 days before a scheduled evidentiary hearing and in the wake of the Plaintiff's insistence on seeing billing records before she replenishes the Defendant's retainer further indicates that Defendant's withdrawal was caused, at least in part by the upcoming evidentiary hearing and Plaintiff's request for billing records.

238.    Notwithstanding the possibility that the Defendant may have had an illness, her history of misrepresentations to the Plaintiff and to the IHO's (e.g. when asking for adjournments of hearings) casts doubt on the veracity of her given reason for withdrawing from representation at the time in question.

239.    Knowing that, upon her withdrawal, the Plaintiff will have difficulty finding replacement counsel at such a late stage of litigation, the Defendant encouraged the Plaintiff to reopen negotiations with the opposing school for a global settlement of all complaints, notwithstanding the unlikelihood of the school yielding to any of the Plaintiffs requests given the Plaintiff's vulnerable state at the time.

240.    While upon withdrawing from representation in the litigation, the Defendant placed a "cap" on her fees to the amount she already received, her setting that maximum amount deflected focus away from the question of how the retainers paid by the Plaintiff were

depleted and whether or not there remained any residual funds which should be returned to the Plaintiff.

241.    When the Defendant had requested a replenishment of funds, in August and December of 2018, and the Plaintiff had specifically requested the billing statements, the Defendant informed the Plaintiff of her intent to provide the statements but then continued to withhold those records, thus refusing to give the Plaintiff the opportunity to contest or clarify potentially unjustified charges.

242.    To the extent that the Defendant later claimed, in 2020, that whatever records she kept had been lost due to computer problems at one of her previous firms, she only brought up this issue with the Plaintiff's new counsel and did not share this information to the Plaintiff when the latter specifically requested such records in August 2018, in December 2018, and in May 2019, thus belying the Defendant's claim.

243.    Instead of disclosing her loss of or failure to maintain billing records, and that failure's potential to adversely impact the Plaintiff's recovery of fees, the Defendant continued to demand replenishment of funds and falsely informed the Plaintiff that she will provide the requested billing statements.  However, she ultimately did not do so.

244.    Knowing the Plaintiff's intent to ultimately recover attorney's fees, the Defendant withheld from the Plaintiff information that could have impacted her decision to continue the Defendant's full representation and funding.  Thus, the Defendant engaged in self-dealing that breached her fiduciary duties to the Plaintiff to act with honesty, candor, and loyalty.

245.    When the Plaintiff had managed to retain other counsel to represent herself, MV, and WV in federal court, and the new counsel contacted the Defendant to obtain her billing records,

the Defendant continued to mislead Plaintiff's counsel by assuring them that she will provide the said records, but ultimately failed to do so.

246.    Thus the Defendant continued to undermine the Plaintiff's efforts to recover attorney's fees and continued to protect the Defendant's own interests in retaining the full amount the Plaintiff paid, including that amount that may exceed the limits of what the court would deem "reasonable."

247.    Had the Plaintiff known of the Defendant's conflicts of interest, self-dealing, and other obstacles that would prevent her from prevailing and recovering attorney's fees, she would have  refrained from retaining the Defendant's services or declined to change the Defendant's billing arrangements.  If necessary, she would have proceeded without an attorney during the administrative hearing, which would have prevented her from incurring the Defendant's unrecoverable fees.

248.    But for the Defendant's misrepresentations and withholding of information regarding conflicts of interests that were detrimental to the Plaintiff's cases, the Plaintiff would not have continued to replenish her retainer and would have continued *pro se* during the administrative proceedings, had she needed to, and as she eventually did.

249.    Insofar as the disclosure of these conflicts of interests would have dissuaded the Plaintiff from retaining the Defendant or from replenishing the retainer agreement, the Plaintiff is entitled to the disgorgement of fees paid to the Defendant.

**Count II**
**Unjust Enrichment**
**CPLR § 213(1)**
**September 2016 and June 2017 Due Process Complaints for MV**

250.    The Plaintiff restates the preceding paragraphs as if fully stated herein.

251.    The Defendant agreed to represent the Plaintiff and to seek recovery for attorney's fees on behalf of the Plaintiff.

252.    The Defendant changed the terms of the initial retainer agreement from a flat fee to an hourly fee and failed to provide clear written guidelines regarding the Defendant's billing practices.

253.    The Defendant billed the Plaintiff for full representation while, in actual practice, she provided representation of a limited scope in that she allowed the Plaintiff a great level of autonomy, and the Plaintiff represented herself for the most part.

254.    The Defendant failed to discuss with the Plaintiff the option of a limited scope representation and failed to rewrite the retainer agreement to reflect that level of representation, which was actually the one implemented to the extent that the Defendant relied on the plaintiff to take the initiative in controlling the legal strategy and presentation of the case.

255.    Until the Plaintiff filed her complaint in federal court *pro se* and discovered the Legal Assistance Group that helped *pro se* plaintiffs, the Plaintiff was unaware of the availability and nature of limited scope representation and only then realized that her relationship with the Defendant during the administrative proceedings was more accurately described by limited scope representation.

256.    The Defendant improperly required the Plaintiff to consult her regarding every aspect of the litigation, thus subjecting the Plaintiff to billable time, when the Defendant had little to contribute to the decision-making process, having transferred to the Plaintiff most of the burden of determining the legal arguments and their presentation.

257.    To the extent that the Defendant mostly contributed by changing the sentence structure and verbiage of the Plaintiff's written work, that the Defendant recognized the Plaintiff's ability to analyze the hearing record and present legal arguments, and that the Defendant did assign to the Plaintiff those tasks, then the Defendant should not have deemed it necessary to fully represent the Plaintiff or to bill her for services that she did not need to perform.

258.    The Defendant should have billed the Plaintiff only for time spent in reviewing the Plaintiff's written work for proper form prior to submission, for procedural guidance, and for the Defendant's attendance during actual hearings rather than for time spent in reviewing documentary evidence or writing briefs, which she did not actually need to do but for the purpose of maintaining the illusion that she was providing full representation.

259.    It was not the Defendant but the Plaintiff who generated legal arguments, decided on the documents to be submitted as evidence, compiled the exhibits, and eventually gave substance to the post-hearing summary of arguments.

260.    The Defendant failed to allocate adequate time for reviewing the record and writing the brief herself and failed to give the Plaintiff due notice of her intent to have the Plaintiff ultimately write the brief herself.

261.    The Defendant's misrepresentation of her service as full representation and her requirement that the Plaintiff obtain her approval of every act and argument actually proved detrimental to the interest of the Plaintiff, as set forth below.

262.    To the extent that the Defendant allowed the Plaintiff to take the initiative—e.g. to write the due process complaint, to compile the evidence to be presented during the hearings, and to write the majority of the post hearing summary of arguments—the Defendant failed to

recognize and follow the arguments being shaped by the Plaintiff during the course of the proceedings.

263.    The Defendant failed to invest adequate time and effort in becoming familiar with the issues raised in the complaint and those which arose during the course of the proceedings.

264.    Instead of allocating time for discussion and review of the record, the Defendant ignored the Plaintiff's multiple requests to discuss the post-hearing arguments, and the Plaintiff did not discover, until only 3 days remained before the post-hearing brief's deadline, the extent to which the Defendant failed to grasp key issues that needed to be brought to the attention of the IHO-M.

265.    As a result of her reliance on the Defendant to perform the work, the Plaintiff lacked the time to better structure and develop the arguments that should have been presented in the post hearing summary brief.

266.    Because the Defendant failed to allocate adequate time for her to review the Plaintiff's arguments, she was only able to review the first 10 out of the 45 pages of the final brief, and even then, performed only minor revisions in sentence structure and verbiage.

267.    Thus, the Plaintiff performed much of the work requiring an attorney, and the act of submitting hearing exhibits and other documentary evidence for the Defendant to sanction served only as a formality that held little purpose other than to generate revenue for the Defendant.

268.    The Defendant then failed to provide the Plaintiff with billing records when the Plaintiff requested them, thus depriving the Plaintiff of the opportunity to question or contest the disparity between the hours billed and the Defendant's work reflected by the post-hearing summary of arguments the Defendant produced.

269.    The Defendant demanded another $5000 retainer for the Plaintiff's second complaint
(DPC-M2) filed in June 2018, notwithstanding the fact that it consisted largely of the
arguments already written by the Plaintiff's in her May 2018 *pro se* complaint but which the
Defendant had withdrawn and rewrote in a single day.  Furthermore, she assigned to the
Plaintiff part of the research for the opposing brief.

270.    The Defendant did not draw up a separate retainer agreement for DPC-M2, did not
provide the billing record for services rendered for that action, and did not indicate what
remained of the funds after that short-lived action was consolidated with DPC-M1 and then
dismissed.

271.    In light of the Defendant's purportedly reduced hourly rate of $200, the Plaintiff's total
replenishments--approximately $58,000 between March 2017 and August 2018-- could not
have been depleted by the Defendant's work on the post-hearing arguments and the time
spent for travel and physical attendance at the hearings for DPC-M1.

272.    The Defendant's repeated demands for purported "replenishments" of her retainer created
the illusion that she spent hours outside of the actual hearing to review the record and to
work on the post-hearing brief, but this presumption was not reflected in either her actual
work or in billing statements.

273.    The Defendant was enriched through her repeated demands for replenishments of the
retainer, which gave the impression that the Defendant was engaged in billable tasks leading
to the creation of the post-hearing brief, when, in fact, she relied on the Plaintiff to supply the
bulk of the argument therein.

274.    By directing the Plaintiff to perform work she herself was expected to do, and by billing for that work without evidence of having actually performed the work herself, the Defendant unjustly enriched herself at the Plaintiff's expense.

275.    By reporting to the Plaintiff that the retainer had been depleted and demanding replenishment of funds without evidence that the Defendant performed the work expected of an attorney, the Defendant was enriched at the Plaintiff's expense.

276.    Had the Defendant intended to rely predominantly on the Plaintiff's work instead of the Defendant's own, the Defendant should have disclosed that intent to the Plaintiff and formulated a retainer indicating billing practices that reflect the Defendant's reduced workload and Plaintiff's autonomy.

277.    In the alternative, the Defendant should have provided billing statements that reflected the productive time for which she billed, and the nature of the work performed during that time, be it work that truly required an attorney's skills or clerical work.

278.    The Defendant should not have billed the Plaintiff for work that the Defendant did not actually perform; nor should she have billed the Plaintiff hours of research when her own draft consisted of little more than reproductions of boilerplate templates and arguments for a claim for reimbursement under the IDEA

279.    The fact that 3 days prior to the October 11, 2018 deadline for the submission of the post-hearing brief in MV's case, the Defendant was relying on the Plaintiff to insert substantive arguments into the Defendant's draft indicates that, all along, the Defendant had not actually been performing the work expected of an attorney—e.g. reviewing the evidence on the record and the formulating sound legal arguments.

280.    By demanding replenishments of her retainer under the guise that the Plaintiff can recover the fees, but then failing to inform the Plaintiff of the limits of the recovery and failing to perform the required maintenance of records to achieve that recovery, the Defendant was enriched at the Plaintiff's expense.

281.    The Defendant's retention of the benefits she obtained at the Plaintiff's expense would be unjust insofar as:

a.  The Defendant obtained self-enrichment through misrepresentations of her ability to present arguments to support the Plaintiff's claims when, in actuality, she planned on relying on the Plaintiff's own efforts to do so

b.  The Defendant's rudimentary draft of a post hearing brief and instruction for the Plaintiff to substantiate the arguments indicate that the Defendant never intended to prepare her own brief in support of the Plaintiff's position.

c.  To the extent that the Defendant may have been having difficulties formulating her own legal arguments, the Defendant failed to disclose that information to the Plaintiff, which information would have impacted the Plaintiff's decision to continue to pay the Defendant for full representation.

d.  The Defendant preyed upon the Plaintiff's desperation and trust and misled the Plaintiff into replenishing her retainer with the belief that she can recover the attorney's fees paid, when the Defendant had not been maintaining the billing records and investing the effort required for that recovery.

e.  The Defendant failed to disclose to the Plaintiff a conflict of interest that made it more favorable to the defendant if the Plaintiff did not prevail, as stated above in Paragraphs 197-199.

f.  The Defendant failed to provide a billing statement that would have allowed the Plaintiff to contest potentially unreasonable billing practices and to clarify the terms of the Defendant's representation in a new retainer agreement.

g.  The Defendant's failure to maintain billing records evince the Defendant's lack of actual intent to make good on her agreement to attempt to recover attorney's fees for the Plaintiff.

282.  Equity and good conscience require that the Defendant make restitution to the Plaintiff.

283.  In light of the lack of evidence of the Defendant's intent to fulfill the duties reasonably expected from full representation, and the lack of evidence of her actual engagement in the tasks she was paid to perform, it would be unjust to allow the Defendant to retain the fees which she received through deception, and in particular, those fees in excess of the fees that can be justified with <u>contemporaneous</u> billing records or her attendance during the hearings.

**<u>Count III</u>**
**<u>Unjust Enrichment</u>**
**<u>CPLR § 213(1)</u>**
**<u>Representation in Federal Court for MV</u>**

284.  The Plaintiff restates the preceding paragraphs as if fully stated herein.

285.  The Defendant agreed to represent the Plaintiff in federal court and accepted from the Plaintiff a retainer of $5000 for that service.

286.  The Defendant changed the terms of the representation to hourly rates but failed to present to the Plaintiff billing statements to reflect the distribution of the funds the Plaintiff paid.

287.  In January 2019, the Defendant withdrew her representation and agreed to cap her fees— i.e. set a maximum limit--at the amount already paid by the Plaintiff. However, she did not

provide a billing statement to indicate that the maximum amount had been reached and that all funds have been depleted.

288.    The Defendant never made an appearance in federal court to represent the Plaintiff, and thus, the Plaintiff is entitled to a refund of the $5000 retainer marked for that service.

289.    The Defendant was enriched when she received the Plaintiff's $5000 retainer for representation in federal court, but she did not make an appearance for the Plaintiff in federal court, and she failed to refund to the Plaintiff the fees that the Plaintiff paid.

290.    By failing to return the retainer to the Plaintiff and by failing to provide the billing statements that would justify the Defendant keeping the funds, the Defendant was enriched at the Plaintiff's expense.

291.    Equity and good conscience require that the Defendant make restitution to the Plaintiff by refunding the $5000 paid by the Plaintiff.

**Count IV**
**Fraud-based Breach of Fiduciary Duty; Conflict of Interest**
**Fraudulent Inducement**
**NY CPLR § 213(1)**
**Due Process Complaints for WV**

292.    The Plaintiff restates the preceding paragraphs as if fully stated herein.

293.    The Defendant agreed to represent the Plaintiff in her advocacy and litigation against a school district regarding the educational program for the Plaintiff's son, WV.

294.    Contemporaneous with her agreement to represent the Plaintiff in the case for MV, the Defendant accepted payment from the Plaintiff for her representation in WV's case.

295.    As an attorney who accepted from the Plaintiff payment for representation in the latter's complaints against a school district, the Defendant owed to the Plaintiff a fiduciary duty to

act in the Plaintiff's interest and to prioritize the Plaintiff's interests in this matter over the Defendant's own.

296.    The Defendant owed the Plaintiff the fiduciary duties of honesty, candor, and disclosure of matters that are likely to impact the Plaintiff's decisions to pursue a course of action or to abstain therefrom, including any potential or actual conflict of interest.

297.    The Defendant breached her duty to act with honesty, and candor, when she failed to create, within a reasonable time after receiving payment, a retainer agreement clearly indicating to the Plaintiff the scope of her representation and the manner by which she intended to bill for that representation.

298.    Aside from the difference in hourly rate that the Defendant clearly stated to the Plaintiff, it was reasonable for the Plaintiff to expect that the terms of engagement stipulated in MV's case also applied to WV's case.

299.    The Defendant knew, from her representation in MV's case and from the Plaintiff's October 2017 amended due process complaint for WV (DPC-W1), which the Defendant reviewed and helped to draft prior to it being filed by the Plaintiff, that the Plaintiff will be seeking an award of attorney's fees.

300.    While it was in the Defendant's interest for the Plaintiff to pursue multiple suits and, thus, generate fees for the Defendant, it was in the Plaintiff's interest to understand that the court limited recoverable attorney's fees to what is deemed to be "reasonable" and that the Plaintiff may not recover all the fees she paid, even if she prevailed.

301.    The Defendant knew, from her representation in MV's case, that the Plaintiff's understanding of the process by which she may recover attorney's fees was not consistent with the process by which the court awarded reasonable attorney's fees, insofar as the

retainer agreement in MV's case stipulated that, if the Plaintiff prevailed, the Defendant will apply for reimbursement of her fees at her usual rate of $300/hour and that upon the Defendant's receipt of the award of attorney's fees, the Plaintiff will be reimbursed the fees and costs the Plaintiff had paid.

302.    The Defendant knew that the court will only award fees based on hours and rates it deemed to be reasonable, so that the amount may not cover the entirety of the costs paid by the Plaintiff.

303.    The Defendant did not indicate to the Plaintiff that the terms by which she would seek to recover attorney's fees in WV's case differed in any way from the stipulations in MV's case. Thus, the conflict of interest described above, in Paragraphs 197-199, also applied to WV's case, and the Defendant had a duty to disclose to the Plaintiff that conflict.

304.    The Defendant failed to disclose to the Plaintiff the conflict of interest described in Paragraphs 197-199 above.

305.    In light of her knowledge of the Plaintiff's understanding of how attorney's fees are awarded, the Defendant had a duty to disclose to the Plaintiff the process by which she intended to recover attorney's fees for the Plaintiff if those terms differed from the Plaintiff's expectations.

306.    To the extent that knowing there existed a limit on the recoverable fee may have impacted the Plaintiff's decisions to pursue a course of action or to abstain therefrom, the disclosure of that limit constituted a conflict of interest for the Defendant, which conflict she did not disclose to the Plaintiff.

307.    The Defendant fostered a collegial relationship with the Plaintiff and encouraged academic discussions but failed to disclose to the Plaintiff whether or not she was billing for these conversations.

308.    Although the Defendant knew that the Plaintiff intended to recover attorney's fees, she did not divulge to the Plaintiff her true belief that the Plaintiff will not prevail, even though she had known the basis for her misgivings since before the first hearing date.

309.    Knowing that an award of attorney's fees required the Plaintiff to prevail, the Defendant engaged in self-dealing when she withheld from the Plaintiff her belief that the Plaintiff will not prevail while she repeatedly demanded replenishments of her retainer funds, and even encouraged the Plaintiff to initiate an appeal of the IHO-W's dismissal of DPC-W2, thus providing a source of new retainers for herself in the process.

310.    In the alternative, the Defendant also engaged in self-dealing when she attempted to mislead the Plaintiff into believing she would not have prevailed when the Plaintiff had a good chance of doing so.

311.    The Defendant attempted to steer the Plaintiff away from the path towards recovery of attorney's fees by trying to convince the latter that she would not have prevailed and, therefore, she should reattempt settlement with the opposing school.

312.    Thus, the Defendant attempted to keep the Plaintiff from discovering the true reason that the Plaintiff may have difficulty recovering the attorney's fees that she paid —i.e. that the Defendant kept no billing records to support a claim for an award of attorney's fees.

313.    In connection with DPC-W2, the Defendant demanded two deposits of $5000—one for the 5-page opposition to the school's motion to dismiss, and one for the appeal of the dismissal to the OSR.  In light of the Defendant's rate of $150/hour, and the single afternoon

that she had spent with the Plaintiff writing the Request for Review by the OSR, these retainers could not have been reasonably depleted, even if the Defendant wrote a Reply to the opposing party's Answer.

314.    However, the Defendant failed to offer the Plaintiff a return of the funds or to provide the Plaintiff with billing statements to reflect the depletion of the said retainers.

315.    Instead, upon the Defendant's withdrawal from all representation for the Plaintiff, the Defendant informed the Plaintiff that she will "cap" the Plaintiff's entire bill.  However, establishing that maximum limit of payments did not clarify if all the funds paid by the Plaintiff had been depleted, how they had been depleted, and if the Plaintiff was entitled to any refund.

316.    The Defendant was aware of the Plaintiff's interest in being able to ultimately recover attorney fees and that, to do so, the billing records will need to be submitted as evidence in support of the amount the Plaintiff stood to recover.  Thus, the Defendant owed the Plaintiff the duty to maintain billing records.

317.    The Defendant breached her duty to be honest in her dealings with the Plaintiff insofar as she misrepresented her intent to recover attorney's fees for the Plaintiff, as any true intention the Defendant may have had in upholding her obligation to recover attorney's fees is belied by the Defendant's failure to keep the billing records required to support the application for the fees.

318.    To the extent that the Defendant offered and billed the Plaintiff for full representation, and required to be informed of all exhibits the Plaintiff wished to submit and the rationale for the submission, the Defendant also owed the Plaintiff the duty to become familiar with the

record and the arguments and to draft a post-hearing brief to summarize the Plaintiff's arguments.

319.    However, as in MV's case, the Defendant directed the Plaintiff to review the hearing record, to write notes regarding the testimonies of the witnesses, and to cite the evidence in the hearing record to support the Plaintiff's position or refute that of the opposing party.

320.    Then, when the Plaintiff requested billing records prior to providing further replenishments of her retainer, the Defendant suddenly reversed her position and attempted to convince the Plaintiff that she was not going to prevail.

321.    Whereas the Defendant had previously pointed out flaws in the IHO-W's reasoning and encouraged the Plaintiff to appeal the IHO-W's dismissal of DPC-W2, the fact that her change in opinion came in the wake of the Plaintiff's insistence on seeing billing statements indicates that the Defendant's loss of support for the Plaintiff's case was motivated, at least in part, by the Plaintiff's requirement that she produce billing statements before the Plaintiff made any more payments.

322.    The Defendant's attempt to convince the Plaintiff that she will not prevail on account of her having rejected the school's offer of settlement evinces the Defendant's awareness of the Plaintiff's intent to recover attorney's fees, which are usually awarded under the circumstance that the Plaintiff is declared the prevailing party and the award received through judgment is more favorable than that offered by the District through settlement.

323.    The Defendant's revelation of her doubts about prevailing and her previously expressed concern about Rule 68 and the IDEA's provision for an award against a parent's attorney who litigates for frivolous issues or to increase the cost of litigation indicate that the

Defendant's withdrawal from representation was also motivated, at least in part, by her perceived risk of such an award being held against her.

324.    In light of the fact that the Defendant advised the Plaintiff to pursue the appeal of the dismissal of DPC-W2, her abandonment of the Plaintiff constitutes a breach of fiduciary duty insofar as she placed her own interests before those of the Plaintiff.

325.    Although the Defendant stated health reasons for her withdrawal from her representation, her known prior history of fabricating excuses to request adjournments from the IHO calls into question the veracity of that issue as the true reason for her withdrawal, especially in light of the cancellation of the surgery she purportedly scheduled and her return to practice months later.

326.    Furthermore, the Defendant did not mention her concerns for her health when she demanded replenishments of her retainers in December or when the Plaintiff inquired multiple times about her progress on writing the post-hearing summary of arguments the deadline of which was December 2018 with an extension into January 2019.

327.    By refusing to proceed with litigation or to start writing the post hearing brief prior to the December 2018 deadlines for its submission—when the Defendant had felt well enough to request replenishment of her retainer in contemplation of proceeding with litigation for both MV and WV-- the Defendant placed her own interests in this matter over that of the Plaintiff's and breached her fiduciary duty to the Plaintiff.

328.    When the Plaintiff ultimately prevailed on issues raised in WV's complaint and received awards that exceeded those offered through settlement, the Defendant repeatedly assured the Plaintiff that she will provide the billing records but ultimately failed to do so, even when she acknowledged the Plaintiff's need for such records when seeking an award of attorney's fees.

329.    The Defendant continued to misrepresent her intent to provide billing records to the

Plaintiff's new counsel for the federal complaint.

330.    Insofar as the disclosure of the Defendant's billing practice, her doubts about the merits

of the Plaintiff's case, and her conflicts of interests would have dissuaded the Plaintiff from

retaining the Defendant or replenishing the retainer agreement for the Defendant's full or

even limited representation, the Plaintiff is entitled to the disgorgement of fees paid to the

Defendant.

**Count V**
**Unjust Enrichment**
**CPLR § 213(1)**
**Due Process Complaints for WV**

331.    The Plaintiff restates the preceding paragraphs as if fully stated herein.

332.    The Defendant agreed to represent the Plaintiff and to seek recovery for attorney's fees

on behalf of the Plaintiff.

333.    The Defendant failed to create a formal retainer agreement that reflected the Defendant's

billing practices and the level of representation that was actually in effect.

334.    The Defendant led the Plaintiff to believe that she would provide full representation and,

thus, required the Plaintiff to consult her regarding every decision and every exhibit

submitted even though the Defendant intended to rely on the Plaintiff to control the legal

strategy and presentation of the case.

335.    The Defendant demanded multiple replenishments of her retainer knowing that the

Plaintiff paid with the intent to recover attorney's fees, but the Defendant did not fulfill her

required duties of maintaining the billing records required for the recovery of attorney's fees

and of taking such reasonable measures to enable the Plaintiff to prevail.

336.    The Defendant misled the Plaintiff into relying on her support of the merits of the Plaintiff's claims, and she did so to ensure that the Plaintiff will continue to replenish her retainer.

337.    Only when the Plaintiff rightfully insisted on seeing billing records prior to providing further payments did the Defendant divulge that she believed the Plaintiff will not prevail, and then she withdrew her representation, leaving the Plaintiff without a work product to reflect the funding she had already provided to the Defendant.

338.    To the extent that the Defendant's contradictory recommendations attempted to mislead the Plaintiff into taking action that was most profitable to the Defendant at the time but detrimental to the Plaintiff, the Defendant engaged in self-dealing.

339.    The Defendant required the Plaintiff to deposit new retainers for the DPC-W2 and for its review by the OSR—as if each were a separate action even when consolidation with DPC-W1 was requested--but did not draw up a separate retainer agreement for the actions.

340.    Notwithstanding the fact that neither the 5-page opposition to the school district's motion to dismiss DPC-W2 nor the appeal to the OSR of its dismissal should have reasonably consumed the $10,000 in replenishments that the Defendant demanded and received, the Defendant failed to offer the Plaintiff a refund or to provide the Plaintiff with billing statements to reflect the depletion of the funds.

341.    The Defendant ignored the Plaintiff's specific requests for the billing statements.

342.    The Defendant billed the Plaintiff as if she were providing full representation when, in practice, she provided only limited scope representation and did not fulfill the duties inherent in full representation, such as reviewing the hearing record and creating a post hearing brief to summarize the Plaintiff's arguments for the IHO-W.

343.   The Defendant assigned the Plaintiff tasks that reduced the Defendant's own burden of reviewing the records and of formulating a post-hearing brief, but continued to request replenishments of the retainer as if the Defendant were doing work that depleted the retainer.

344.   However, the Defendant provided no billing statements and no work product to reflect the hours billed, notwithstanding the fact that multiple deadlines for the post-hearing brief had come and gone.

345.   The Defendant failed to provide a billing statement that would have allowed the Plaintiff to contest potentially unreasonable billing practices and to clarify the terms of the Defendant's representation in a new retainer agreement.

346.   By continuing to demand replenishments of the retainer, the Defendant was enriched.

347.   By keeping the payments the Plaintiff made but providing no draft of a post-hearing brief to reflect the hours she billed the Plaintiff, the Defendant was enriched at the Plaintiff's expense.

348.   By demanding replenishments of her retainer under the guise that the Plaintiff can recover the fees, but then failing to inform the Plaintiff of the limits of the recovery and to perform the required maintenance of billing records to achieve that recovery, the Defendant was enriched at the Plaintiff's expense.

349.   The Defendant's retention of the benefits she obtained at the Plaintiff's expense would be unjust insofar as:

    a.  there existed a conflict of interest that the Defendant failed to disclose to the Plaintiff

    b.  the Defendant preyed upon the Plaintiff's desperation and trust and misled the Plaintiff into believing that she will make a good faith attempt to recover the attorney's fees paid

c. the Defendant demanded multiple replenishments of her retainer knowing that the Plaintiff intended to recover attorney's fees, but failed to disclose to the Plaintiff the limits of the amount to be recovered

d. the Defendant demanded multiple replenishments of her retainer knowing that the Plaintiff intended to recover attorney's fees, but did not divulge to the Plaintiff her personal belief that the Plaintiff will not prevail based on an issue of which the Defendant had been aware before the first hearing date

e. the Defendant's failure to maintain billing records--which she knows is required for the recovery of attorney's fees—indicates that the Defendant did not truly intend to make good on her agreement to attempt to recover attorney's fees for the Plaintiff

f. the Defendant obtained monetary benefits from the Plaintiff through misrepresentations that she believed the Plaintiff's claims to have merit and that she was going to apply her skills as an attorney to present arguments to support the Plaintiff's claims

g. the Defendant's failure to create even a rudimentary draft of a post-hearing brief, notwithstanding the proximity to the deadline for the submission of that document, indicates that the Defendant never intended to present an argument in support of the Plaintiff's position

350. Thus, equity and good conscience require that the Defendant make restitution to the Plaintiff.

## **Count VI**
## **Deceit and Misconduct by an Attorney (NY JL § 487); CPLR § 213(1)**
## **Exhausted IDEA Administrative Proceedings for MV and WV**

351. The Plaintiff restates the preceding paragraphs as if fully stated herein.

352.    The Defendant is an attorney, licensed in the state of NY, who continually represented the Plaintiff from April 2016 until January 30, 2019, in matters pertaining to the education of her sons MV and WV and her related parental rights.

353.    From the initial consultation with the Defendant, the Plaintiff clearly expressed to the Defendant her intent of pursuing litigation in a court of law, and the Defendant agreed to represent the Plaintiff in court.

354.    The Plaintiff's due process complaints indicate, as one of its purposes, the exhaustion of IDEA procedures and sets forth claims in preparation for bringing suit in a court of law.

355.    Insofar as the IDEA mandates that plaintiffs first exhaust the administrative procedures prior to pursuing claims in a court of law--and that the administrative record serves to inform the court in the subsequent judicial proceedings-- the Defendant's was on notice that her actions during the administrative proceedings will occur in the context of a pending judicial proceeding or one which may be commenced in the future.

356.    To the extent that only a court may order the award attorney's fees to a prevailing party, that the Defendant knew of the Plaintiff's intent to ultimately recover attorney's fees, and that the Defendant agreed to represent the Plaintiff in the process of recovering attorney's fees, the deceptive acts committed by the Defendant during the administrative proceedings evince the Defendant's intent to deceive the Plaintiff and also the court in the contemplated judicial proceedings to be commenced in the future, once the basis for being a prevailing party has been established.

357.    Knowing the complexity of the case the Plaintiff contemplated, the Defendant deceived the Plaintiff into retaining the Defendant's representation for a flat fee, only to later change the fee arrangement when the Plaintiff had little choice but to continue with the Defendant's

representation or go without counsel, in light of the expiring statue of limitations of some of MV's claims.

358.    After securing the Plaintiff's payments for the September 2016 due process complaint on behalf of MV, the Defendant intended to deceive and did deceive the Plaintiff during the course of the 2016 proceedings by withdrawing the complaint without the Plaintiff's knowledge and then informing her that the complaint was dismissed by the IHO-M.

359.    To the extent that the refiled complaint included new issues, those issues could have been filed as a separate new complaint, as permitted under the IDEA, and consolidation requested.

360.    By withdrawing the 2016 complaint without the Plaintiff's permission, the Defendant caused the Plaintiff to incur the added cost of having the Defendant rewrite the entire complaint, refile at a later date, and then address the school's affirmative defense that the statute of limitations had run for events that occurred during the 2014-15 school year.

361.    Throughout the proceedings for both MV and WV, the Defendant willfully manipulated the Plaintiff's suits with a view to her own gain and willfully demanded and received money for which she refused to answer and account, as set forth above in Counts I – V above.

362.    Knowing that the Plaintiff intended to recover attorney's fees, and knowing that it would be necessary to submit billing records to recover attorney's fees, the Defendant intentionally deceived the Plaintiff by repeatedly demanding a replenishment of her retainer without notifying the Plaintiff that she was unlikely to recover the fees in light of the Defendant's failure to maintain billing records.

363.    With hourly rates in effect, the Defendant's periodic requests for "replenishment" of the retainer constituted an attempt to deceive the Plaintiff into believing that the Defendant had

been performing work and thereby depleting funds, while also keeping track of the funds to the extent that she knew when replenishment was needed.

364.    However, the Defendant had not been maintaining billing records and her failure to do so belied any intent on her part to actually fulfill her obligation to recover attorney's fees and to refund the Plaintiff's her payments, as she had agreed to do.  Thus, the Defendant intended to deceive the Plaintiff.

365.    In the alternative, if at any time the Defendant did intend to make an application to the court for an award of attorney's fees, her failure to maintain contemporaneous billing records indicate her intent to deceive the court with fabricated billing records.

366.    The Defendant did not disclose to the Plaintiff that the court only awards fees deemed reasonable and that, in the event the fees the Plaintiff paid upfront to the Defendant was likely to exceed the award from the court, the terms of their retainer agreement would make it more profitable for the Defendant if the Plaintiff did not prevail, as the Plaintiff's loss would relieve the Defendant of the obligation to return to the Plaintiff the fees the Plaintiff had paid.

367.    Rather than disclose the conflict of interest to the Plaintiff, the Defendant deceived the Plaintiff into replenishing the Defendant's retainer multiple times over the course of the proceedings, knowing that the Plaintiff continued to pay with the expectation of recovering the fees.

368.    However, the Defendant's acts which undermined the Plaintiff's cases, as set forth in Counts I and IV above) belie her intent to achieve the status of prevailing party needed to recover attorney's fees.

369.    Throughout the proceedings for both MV and WV, the Defendant requested

"replenishments" thus intending to deceive the Plaintiff into believing that the retainers had

been depleted, but, based on the Defendant's agreed upon reduced rate of $150- $200/hour,

the Defendant's work product failed to reflect that she had invested those hours, and she

provided no billing statements to reflect those hours.

370.    The Defendant continued to demand replenishment of her retainer fee from the Plaintiff

with the intent to deceive the Plaintiff into believing that she was working on summaries of

the arguments or intended to write such summaries for the Plaintiff, but the Defendant had

intended to rely on the Plaintiff's own review and analysis of the hearing record.

371.    Throughout the course of the proceedings for both MV and WV, the Defendant intended

to deceive the Plaintiff into believing that she will provide full representation when, all along,

the Defendant had intended to rely on the Plaintiff's substantial contributions, as evident in

her assigning to the Plaintiff the task of reviewing and analyzing the hearing transcripts and

then leaving the Plaintiff to her own devices when the time came to write the post-hearing

summary of arguments.

372.    Although the Defendant cited health reasons for her withdrawal from her representation,

the chronic pattern of delinquency she manifested throughout the course of the proceedings

for both MV and WV calls into question the true reasons behind her request to withdraw.

373.    The fact that the Defendant had been asking for additional replenishment of her retainer

on December 3, 2018, and that the Defendant's January 30, 2019 withdrawal came in the

wake of the Plaintiff's eventual insistence on billing statements indicate that the Defendant's

withdrawal was precipitated, at least in part, by that insistence on billing records prior to

providing further replenishments of funds.

374.    Furthermore, the Defendant had cancelled the surgery that she claimed to have scheduled during the relevant time and returned to practice a few months later.

375.    The Defendant intended to deceive and did so deceive the Plaintiff into believing that she understood the complex issues contained in the Plaintiff's complaints, saw merit in the claims, and was invested in the full representation of the Plaintiff.   However, it was ultimately revealed that the Defendant intended to leave the Plaintiff to her own devices.

376.    By requesting replenishments of her retainers while failing to provide billing statements, the Defendant perpetuated an illusion that she was accumulating billable hours, but the work she eventually produced did not reflect such hours.

377.    The Defendant failed to disclose to the Plaintiff a conflict of interest—i.e. the possibility that, in the event the amount paid to the Defendant exceeded that which the court was likely to award, the Defendant stood to gain more from the Plaintiff's loss, which loss guaranteed the Defendant's retention of all fees paid by the Plaintiff while divesting the Defendant of the obligation to attempt to recover attorney's fees for the Plaintiff.

378.    The summation of Defendant's actions indicate that the Defendant was more intent on maintaining the influx of the Plaintiffs payments and the Defendant's retention of the full amount paid while minimally investing in, and even undermining, the Plaintiff's goal of prevailing and ultimately recovering attorney's fees.

379.     Had the Defendant's divulged earlier her intent to eventually rely on the Plaintiff to shoulder much of the work, the Plaintiff would not have retained her full representation.

380.    Had the Defendant expressed her doubts about the Plaintiff's ability to prevail in WV's case, the Plaintiff would not have retained her full representation and relinquished control of the management of the case.

381.    Had the Defendant disclosed the conflict of interest inherent in the Defendant's proposed method of recovering attorney's fees, the Plaintiff would not have agreed to the hourly billing and would have proceeded *pro se* or taken other precautions against the possibility of the Defendant undermining her goal of prevailing—e.g. retaining another attorney or advocate or converting to limited scope representation while maintaining control of the case.

382.    In light of the Defendant's chronic pattern of legal delinquency and her having obtained the Plaintiff's trust and replenishments of her retainer through deception regarding the Defendant's ability and willingness to faithfully represent the Plaintiff, the Defendant should forfeit to the Plaintiff  approximately $225,000.00—i.e. treble the approximate amount of $75,000 in replenishments that the Plaintiff paid to the Defendant during the course of the procedures for MV and WV.